St. Louis, Iron Mountain & Southern Railway Company

v. Mangan.

Opinion delivered June 8, 1908.

1. Master and servant—assumed risk.—It was not error, in a suit to hold a master liable for negligently causing the death of a servant by maintaining a defective place for work, to charge the jury

that if the servant knew of the particular risk, but made complaint thereof to his foreman who promised to repair the defect, and the servant, relying upon such promise, continued to work, and the risk arising from the defective condition of the premises was not so obvious that an ordinarily prudent person would not have continued in the work, then it was a question for the jury to say whether deceased assumed the risk from the condition of the premises. (Page 512.)

2.  Same—Defective place of work.—It was negligence for a railroad company to allow the existence of such a depression in its switch yard as would ordinarily be dangerous to switchmen employed therein. (Page 513.)

3.  Same—Effect of master's promise to make repairs.—Although a servant who remains in his master's employment for a year after he discovers that his place of work is in a defective condition will be held to have assumed the risk therefrom, yet where the master promises to repair the defect, the servant is relieved of the assumption of risk during a reasonable time for the master to make his promise good, unless the danger is so imminent that no prudent person would continue in it. (Page 515.)

4.  Same—To whom promise to repair should be made.—In order that a promise by a master or vice-principal to make repairs may be relied upon by a servant, it is not essential that the promise should have been made directly to the servant, but it is sufficient that the promise should have been communicated to the servant and relied upon by him. (Page 516.)

Appeal from Miller Circuit Court; *Jacob M. Carter,* Judge; affirmed.

*Tom M. Mehaffy* and *J. E. Williams,* for appellant.

1.  Deceased assumed the risk as one of the hazards of the employment in which he was engaged; he had used the switch for a year, and knew of the conditions. The court should have given the peremptory instruction to find for defendant. 82 Ark. 14; 37 Minn. 326; 33 N. W. 908; 5 Am. St. 851; 108 Wis. 530; 53 S. R. A. 657; 35 W. Va. 500; 55 Ark. 483; 18 S. W. 933; 138 Ind. 290; 37 N. E. 721; 43 Am. St. 384; 87 Me. 352; 32 Atl. 965; 167 Pa. 220; 15 Mont. 290; 39 Pac. 85; 81 Ark. 343; 77 *Id.* 367; 56 *Id.* 232; 41 *Id.* 542; 54 *Id.* 389; 56 *Id.* 206; 57 *Id.* 76; 68 *Id.* 316; 80 Wis. 350; 1 Labatt on Master and Servant, 260, 266, 267. Here the danger was obvious, and no prudent man would have taken the risk. The promise to

repair does not excuse him.  77 N. E. 1120; 220 Ill. 614; 91 S. W. 161; 115 Mo. App. 520; 63 'Atl. 719; 141 Fed. 966; 55 Ark. 484.

2.  He assumed the risk in stepping off at a place known to be dangerous when he could have stepped off at some other place just as well.  165 Mass. 16; 137 Ind. 208; 129 *Id.* 3-7; 112 *Id.* 592; 130 *Id.* 242; 136 *Id.* 242; 79 Me. 297; 12 Ill. App. 369.  And this is true even when a promise to repair by the master is shown.  20 Am. & Eng. Enc. Law, p. 127; 55 Ark. 484.

3.  As a matter of law, deceased assumed the risk, and the court should have so held.  82 Ark. 14; 36 Kan. 129; 79 N. E. 222; 80 *Id.* 65; 108 N. W. 1021; 145 Mich. 509; 87 Pac. 973; 34 Mont. 590; 57 Ark. 461; 73 *Id.* 383; 76 *Id.* 96; 77 *Id.* 757.

4.  We especially call attention to the error in instruction No. 8.  77 Ark. 461, 367.

*Smelser & Vaughan* and *Scott & Head,* for appellee.

1.  Deceased had a right to rely upon the repairs being made, as promised by the master.  216 Ill. 624; 75 N. E. 332; 54 Ark. 289; Wood on Master and Servant, § 352; 154 U. S. 200; 1 Labatt on Master and Servant, § 432; 81 S. W. 487; 41 Pac. 551; 51 N. E. 449; 78 *Id.* 417; 50 S. W. 601; 72 *Id.* 1028; 58 N. E. 416; 16 Pac. 46; 90 N. W. 976; 53 L. R. 'A. 653; 21 S. W. 326.  The promise was made by one in authority.  6 S. E. 53; 29 N. E. 714; 80 Fed. 257.  It was sufficient.  67 Minn. 358; 63 Ill. App. 165; 96 Ill. 616; 105 N. W. 568; 96 Ill. App. 616; 37 N. W. 908; 33 N. W. 908; 88 S. W. 167; 49 N. Y. 521; 49 Fed. 723; 139 *Id.* 519.

2.  Deceased did not assume the risk as a matter of law; it was a question for the jury, even where there is no promise to repair.  109 Fed. 436; 183 U. S. 695; 97 Fed. 423; 53 *Id.* 65; 128 U. S. 91; 138 N. C. 401; 18 S. W. 976; 155 Mass. 155; *Ib.* 513; 4 S. E. 211; 49 S. W. 204; 62 Pac. 964; 108 Ill. 538; 45 Atl. 676; 27 Pac. 728; 18 S. E. 584; 30 S. W. 125; 26 S. E. 669; 50 Pac. 834; 74 N. W. 377; 52 *Id.* 983; 58 N. E. 416; 50 S. E. 703; 49 Fed. 723; 52 *Id.* 87.

3.  If he knew there was some risk attached, this would not, as a matter of law, bar a recovery.  30 N. E. 366; 67 *Id.* 609; 47 N. W. 1037; 22 So. 742; 30 Atl. 16; 29 N. E. 464; 62

N. W. 692; 31 S. E. 276; 20 N. W. 147; 24 Id. 311; 77 Ark.
367; 79 Id. 53; 48 *Id.* 333.

4. There is no contributory negligence. Wood, Master
and Servant (2 Ed.), § 378; 18 Am. Rep. 412; 8 Allen, 441;
103 Fed. 265; 21 S. W. 326; 53 Ark. 458; 82 *Id.* 137; 1 Labatt,
Master and Servant, § 300; 79 Ark. 137, 241; 78 *Id.* 520;
*Ib.* 355, 251; 83 *Id.* 61; 82 *Id.* 343; 80 *Id.* 169.

5. The plaintiff's instructions were correct, and there
is no error in No. 8. 84 Ark. 74; 75 Ark. 76; 99 S. W. 73;
69 Ark. 632; 56 *Id.* 594; 65 *Id.* 54; 73 *Id.* 594; 83 *Id.* 61; 75 *Id.*
325; 76 *Id.* 224; 77 *Id.* 458.

6. Defendant's instructions were not applicable to the
case. They all told the jury, as matter of law, that deceased as-
sumed the risk if he knew the condition of the ground, or might
have known by the exercise of ordinary care, etc. See cases
*supra;* 79 Ark. 53; 77 *Id.* 367; 43 S. W. 508; 83 Ark. 318; 166
U. S. 17.

Hill, C. J. John Mangan was a switchman in the employ
of the appellant railroad company in its yards at Texarkana,
and had been so employed for three years. His usual duties
at the time of his injury were on the night crew. Prior to the
4th of November, 1905, he had been laying off for several days,
the exact number not being shown. On said day he was called
upon as extra switchman to do day work, owing to the absence
of some of the day crew. Passenger train No. 5 came in the
yards, and some switching had to be done, and a coach for
negro passengers set out on track 21, and the train had to be
prepared to go out within ten minutes of its arrival.

In the performance of his duties, Mangan rode upon a
coach until near switch 22, when he alighted from the slowly
moving train in order to throw said switch; and as he alighted
from the train he slipped and fell under it, and was run over
and horribly mangled. Three days later, after enduring great
mental and physical suffering, he died in the railroad hospital
in St. Louis, to which place he had been carried to receive sur-
gical treatment.

He left a widow, who was appointed administratrix of the
estate, and two children. This is an action by the administra-
trix to recover for the loss to the estate and to the widow and

children.  The jury returned a verdict for $5,000 on the first count, and for $12,500 on the second count.  Judgment was entered thereupon, and from it the railroad company has appealed.

Negligence of the company was alleged to have been committed in failing to have a reasonably safe place for the performance of his duties as switchman.  The facts in regard thereto, as established by the evidence which has been credited by the jury, were as follows:

The yards of the appellant company as originally constructed were level, the surface of the ground being even with the ties.  But depressions had occurred in different parts of the ground, one of which existed around the head block of switch 22.  It was a kind of sinking slope, a low place in the ground probably a foot and a half across on each side, and two or three or four inches deep, shaped like a dish-pan.  This depression or worn place around the switch was caused by the switchmen stamping around it, and it would always be slippery when it rained.  In wet weather it would be filled with water, and this rendered the place dangerous to the switchmen in the performance of their duties in that it made the ground slippery and muddy and the water concealed the exact condition of the surface underneath.  This condition had existed for about a year.  The proper care of the yard required that this depression be filled with cinders or gravel.  The water also stood in wet weather along the track for some distance at this point, and the surface was so covered that a switchman alighting from a car could not make selection of a proper place to get off.

There had been a heavy rain the day that John Mangan was injured, and the season had been very wet.  William Mangan, brother of the deceased, was also a switchman, and was extra foreman of a switch crew, and John at times worked under him, and was doing so on the day he was killed.

Several days before the injury, Mr. W. H. Saunders, the yardmaster, fell at this same switch, and William Mangan told him that it was dangerous and ought to be fixed, and Saunders promised he would have it fixed as quick as he could get the cinders for it.  Shortly after this John Mangan complained to his brother about the danger at this switch, and Wm. Mangan

told him of the promise of Saunders to him to have it repaired. This conversation is not more definitely fixed than a few days before John's injury.

The only material conflict in the evidence is upon three points: First, whether this depression was filled with water at the time Mangan fell; second, whether this depression was filled up with cinders before or after the accident; and third, whether he had alighted from the train in a careful and orderly manner or whether he had recklessly leaped therefrom. All of these conflicts have been settled against the railroad company, and upon this hearing it must be taken that this depression was concealed by a thin sheet of water, that the cinders had not been placed in there at the time, and that Mangan descended from the coach in a careful manner and fell on account of the slippery and muddy condition of the place where he was required by his duties to alight.

Three questions arise upon these facts: First, as to the assumption of the risk; second, as to the reliance upon a promise of repair; and third, as to the contributory negligence of John Mangan. The latter proposition may be disposed of speedily, for it presented a question of fact which has gone to the jury upon appropriate instructions, and there was no contributory negligence *per se* which would call on the court to interfere with the finding of the jury upon that issue.

The turning point of the case is presented in the 8th instruction, which is as follows:

"8. The court instructs the jury that if you should find from the evidence that the deceased knew of the condition of the roadbed at the point where he was injured, still, if you should further find from the evidence that the deceased complained to the defendant or his immediate foreman under whom he was working of the condition thereof, and that the said foreman thereupon advised the deceased that the defendant had promised to repair the same as soon as it could get the cinders with which to do the work, and that thereafter, relying upon such promise, the deceased continued work in the employment of the defendant, and that the danger arising from the said condition of the said premises was not so obvious, imminent or glaring that an ordinarily prudent person would not have contin-

ued in the same work, then it is for you to say, under all the facts and circumstances of the case, whether the deceased did in fact assume the risk arising from the said condition of said premises."

This instruction and the other instructions in the case are in accord with the principles announced in *Patterson Coal Co. v. Poe,* 81 Ark. 343; *Mammoth Vein Coal Co. v. Bubliss,* 83 Ark. 567; *Louisiana & Ark. Ry. Co. v. Miles,* 82 Ark. 534; *Choctaw, O. & G. Rd. Co. v. Craig,* 79 Ark. 53; *Choctaw, O. & G. Rd. Co. v. Jones,* 77 Ark. 367. Is there sufficient evidence to sustain a verdict under these instructions? Primarily, the inquiry is whether the condition of the ground was one of the ordinary risks of the service assumed by the servant, or whether it was due to a default in duty of the company.

The duty of the master in regard to a safe place to work in switch yards is thus stated by the Texas court: "As an incident to operating trains, cars must be coupled and uncoupled in placing them in or taking them from the train and moved from one track to another. In making up trains this is generally done in switch yards where switches, switch-stands, frogs, side-tracks, etc., are maintained for such purpose. In doing this work, which, under the most favorable conditions, is perilous, the duty of exercising ordinary care (which is gauged by the danger to the servant) is imposed upon the company to maintain the grounds, tracks and all appliances and instrumentalities in the switch yard for doing it in a reasonably safe condition." (Citing authorities). *International & G. N. Ry. Co. v. Rieden,* 107 S. W. 661. And in the same case the court further said: "The work of coupling and uncoupling cars, especially from the manner it was done before they were equipped with automatic couplers, requires the roadbed to be free from such defects or obstructions as might reasonably be supposed to unnecessarily increase the danger. Hence, duty of the company to use ordinary care to keep that part of it designed for such work free from such defects and obstructions."

In *Haggerty v. Chicago, M. & St. P. Ry. Co.,* 73 C. C. A. 282, 141 Fed. 966, (in the Circuit Court of Appeals of this circuit), the negligence was predicated upon the existence of drains in the switching yards, into one of which a switchman

fell. The court said: "It was the duty of the railway company to use ordinary care to furnish Haggerty with a reasonably safe place in which to perform his duties, and it was also the duty of Haggerty to use ordinary care to not unnecessarily expose himself to dangers which he knew or in the exercise of ordinary care might have known. He assumed, when he entered the employ of the company as switch tender upon the yards in question, the ordinary risks and hazards of the service in which he was engaged, which he knew or which a reasonably prudent and careful man might have known. This case is clearly distinguishable from those cases where a master has allowed holes or culverts to remain uncovered at and about the place where the servant is obliged to perform his duties. The small ditch or drain in question was not what is known as a culvert, but a part of a system found necessary for the carrying off of surface water from the yards into larger drains or culverts, which were covered."

It follows from these statements of the duty of the railroad company that it was negligence to allow the existence of such a depression as a switching place where switchmen would have to perform their duties, for it was shown that such depression in wet weather was dangerous to them. This condition could have been known to the yardmaster—the vice principal—and he was notified of its danger and promised to speedily repair it. It must be taken then that it was not a hazard of the employment, but a default of the master, which produced the injury. That Mangan's death directly flows from this negligence is established by evidence stamped as true by the verdict. But that does not end the matter, for the negligence of the master may be assumed when known to exist, as well as the ordinary hazards of the service.

What was said by Mr. Justice RIDDICK *in Choctaw, O. & G. Rd. Co.* v. *Jones,* 77 Ark. 367, applies here: "In the application of the doctrine of assumption of risks a distinction must be also made between those cases where the injury is due to one of the ordinary risks of the service, and where it is due to some altered condition of the service, caused by the negligence of the master. The servant is presumed to know the ordinary risks. It is his duty to inform himself of them; and if he

negligently fails to do so, he will still be held to have assumed them. * * * But the servant is not presumed to know of risks and dangers caused by the negligence of the master, after he enters the service, which change the condition of the service. If he is injured by such negligence, he can not be said to have assumed the risk, in the absence of knowledge on his part that there was such a danger; for, as we have before stated, the doctrine of assumed risk rests on consent; but, if the injury was caused in part by his own negligence, he may be guilty of contributory negligence. On the other hand, if he realizes the danger, and still elects to go ahead and expose himself to it, then, although he acts with the greatest care, he may, if injured, be held to have assumed the risk." Citing authorities.

It must be held that continuance in the employ for about a year with knowledge of the condition of this place would be an assumption of its risk, and the case narrows to whether it falls within the exception based on the promise to repair. The rule governing it may be thus stated: where the master promises to repair, then the servant is relieved of the assumption of the risk for a reasonable time for the master to make his promise good, unless the danger is so imminent that no prudent person would continue in it. *Gowen* v. *Harley,* 56 Fed. 963, 6 C. C. A. 190; *Patterson Coal Co.* v. *Poe,* 81 Ark. 343; *Mammoth Vein Coal Co.* v. *Bubliss,* 83 Ark. 567; *Kansas & T. Coal Co.* v. *Chandler,* 71 Ark. 518.

When the danger is so obvious and imminent that the servant is not justified in continuing in the employ, it is usually held to be contributory negligence if he does so, and not an assumption of the risk; although, as stated by Judge Taft in *Narramore* v. *Cleveland, C. C. & St. L. Ry. Co.,* 96 Fed. 298, "assumption of risk and contributory negligence approximate where the danger is so obvious and imminent that no ordinarily prudent man would assume the risk of injury therefrom." The distinction between the two becomes more theoretical than substantial, as pointed out by Mr. Justice Riddick in *Mammoth Vein Coal Co.* v. *Bubliss, supra.*

. Judge Sanborn, for the Circuit Court of Appeals of this circuit, in *Chicago G. W. Ry. Co.* v. *Price,* 97 Fed. Rep. 423, stated the kind of danger referred to, as follows: "The rule

is that the danger from the defects of the railroad or machinery furnished the employee must have been so obvious and threatening that a reasonably prudent man in his situation would have avoided them, in order to charge the injured servant with contributory negligence because he continued in the discharge of his duty, and thereby assumed the risks." (Citing many cases.) It can not be said as a matter of law under the facts here that the danger was so obvious that Mangan was precluded from relying upon the promise. It was a question of fact.

This brings finally to consideration the only sustaining proposition of the plaintiff's cause—the promise of the master to repair. Without this promise, the long continuance of John Mangan in the performance of his duties in this yard where he knew this depression existed, and the danger incident thereto in performing his duty as a switchman, would require the court to hold as a matter of law that he had assumed the risk of the existing condition. But the testimony discloses that he complained to his brother, who, on the day of his injury, happened to be his foreman, though he was not acting as such at the time of the complaint; and his brother told him of the promise of the yardmaster to fill this depression as soon as he could get the cinders. This occurred several days before the injury; and for some days prior to his injury John Mangan was not at work, so that there was no showing that he knew the promise was not fulfilled when he alighted in this depression. Even if he had known it, yet for a reasonable time to allow the redemption of the promise the assumption of the risk was in abeyance.

It is said that this promise was not made to John Mangan, and that his complaint had been to William Mangan, who was only foreman at the time of a crew of switchmen, and that such foreman could not bind the company by a promise to repair. *Albrecht* v. *Chicago & N. W. Ry. Co.*, 108 Wis. 530, L. R. A. 657, is cited to sustain this contention. But the promise was not from William Mangan. He was a mere medium in conveying to John Mangan the promise of the yardmaster that this defect would be repaired, and it makes no difference that this promise from the yardmaster was not directly given to John Mangan, but came through another servant. This point

was thus decided by the Supreme Court of Illinois: "There was no error in admitting evidence of the promise made by Hawley to repair the appliances. The objection made to the evidence is that the promise was made to the machine runners who operated the machine, and was communicated to the plaintiff by them, instead of being made to the plaintiff directly. It was proper to prove that the promise was made through other servants of the defendant who notified the machine boss of the defect. The promise to repair was made to the machine runners, and when the plaintiff complained of the condition of the appliances, and said that he was not going to move the machine any more unless it was fixed, they told him of the promise, and he relied on it. It was not necessary for him to go to Hawley and receive the promise personally." *Odin Coal Co. v. Tadlock,* 216 Ill. 624.

The promise emanated from the yardmaster in control of the yard; it was conveyed to the deceased by his brother, who sometimes acted as foreman, and it was a promise consistent with the usual and proper method of repairing the yards. It was not an unreasonable time which elapsed from the promise till John Mangan resumed work on the morning of the injury, and there is no evidence that he knew that the promise had not been redeemed at the time he was called upon to alight from the train at this particular place in the performance of his duty.

The court is of opinion that the evidence sustains the verdict, and that the instructions are right. There has been some criticism of the instructions, but it would not be profitable to review them because they are drawn from the recent cases herein referred to, and contain no new principles or departures from established precedents. Every phase of the case that either party was entitled to have sent to the jury was sent to it under proper instructions.

The judgment is affirmed.