CHICAGO MILL & LUMBER COMPANY *v.* WELLS.

Opinion delivered December 18, 1911.

1. MASTER AND SERVANT—ASSUMED RISK—PROMISE TO REPAIR.—In order that a servant may be relieved from the operation of the doctrine of assumed risk from a defect complained of, and the danger of which he is no longer willing to incur, it is essential that his remaining in the service should have been induced by the master's promise to repair the defect when he would not otherwise have done so. (Page 541.)

2. SAME—EFFECT OF PROMISE TO REPAIR MADE TO FELLOW-SERVANT—One servant can not rely upon a promise to repair made by the master or vice principal to a fellow-servant unless he is informed of such promise. (Page 542.)

3. SAME—ASSUMED RISK—STRUCTURAL DEFECTS.—Where a servant had knowledge of structural defects in the machinery about which he was employed, he will be held to have assumed the risk therefrom, in the absence of any promise to repair on the master's part. (Page 543.)

Appeal from Greene Circuit Court; *Frank Smith,* Judge; reversed.

*Coleman & Lewis,* for appellant.

1. The uncontroverted facts show that there was no liability on the part of the appellant. This is a clear case of assumption of risk by a servant who knew and appreciated the danger incident to the work, and who voluntarily continued therein after the master had refused to "give him any satisfaction" about repairing the machine, 90 Ark. 387; 81 Ark. 343; 82 Ark 11.

2 Under the undisputed evidence, there was no issue as to the carriage or apron, and the court should have given instruction "E," requested by appellant. As originally built, the saw frame had no apron on the outside of it, and was not intended to have one. Appellee knew of the condition of the saw frame at the time he accepted the employment, and admits that he appreciated whatever danger was liable to flow from it. He could not require the master to reconstruct his machine. He had the option at the time he accepted the employment of working with the machine as it was then or of not entering the service. 26 Cyc. 1205; 90 Ark. 145; 184 Fed. 43.

*J. T. Coston,* for appellee.

1.  The promise to repair the machine was given by Bates "at the machine" where he could see all the defects, and his promise to "fix it" under such circumstances unquestionably meant that he would remedy all the defects.   Waldron's testimony shows that both he and Wells at that time complained to Bates about the condition of the machine, and his promise to "fix it," though addressed to Waldron, was for the benefit· of Wells, who was present and heard the promise, and who occupied the place of danger in the work; and Wells had the right to rely for a reasonable time upon the promise to repair without in the meantime assuming the risk.   It is immaterial, so far as the liability of appellant is concerned, whether the injury was due to one or many defects.   If the evidence establishes one of the defects alleged and a promise to repair it, and that defect contributed in any degree to the injury, appellant would be liable, whether the other alleged defects were proved or not.   29 N. E. 717.   Whether the promise to repair was made to Waldron or to Wells is immaterial; if Wells heard the promise and relied on it, he can recover.   112 S. W. 171; 90 Ark. 566; 1 Labatt, Master & Servant, 1190; 29 N. E. 716; 67 Mo. App. 389; 83 N. W. 597; 43 Ia. 662; 29 N. E. 715; 18 S. W. 700.

2.  The doctrine of assumed risk rests upon contract, it is true, but what that contract was before Wells made complaint to, and the promise of, Bates to repair does not affect this case, for by this promise a new relation was created between appellant and Wells whereby appellant impliedly agreed that he should not be held to have assumed the risk for a reasonable time following the promise, during which time the burden of the assumption of risks and the responsibility for any injury resulting to the appellee by reason alone of the defective conditions was on appellant.   90 Ark. 566.   And this rule is the same whether the defects and danger arose before or after the servant's employment.   1 Labatt, M. & S. 1194; 49 Atl. 1036, 1037.   There can be no assumption of risk by the servant where the master has been guilty of gross negligence, as shown in this case.   138 S. W. 471; 92 S. W. 247; 48 Ark. 467.

HART, J.   This is an action for damages for personal injuries brought by H. B. Wells against the Chicago Mill &

Lumber Company. The defendant owned a small portable wood saw, operated with a gasoline engine. The machine was constructed upon a frame on wheels, so that it could be moved about from place to place. It was used for the purpose of sawing up odds and ends of lumber into fire wood, and was operated by a crew of three men, consisting of a sawyer and two assistants, one of whom brought the sticks or pieces of lumber to be sawed; and the other caught the pieces after they had been sawed and threw them away from the saw.

The plaintiff was employed as a member of this crew, and admits that it was his duty to fill any one of the three positions. He was injured on the 15th day of January, 1910, while running the saw, and John Walden was carrying the sticks to the saw carriage, and Sherman Watson was carrying them away after they had been sawed. Sherman Watson was not there when the accident happened, and the plaintiff, Wells, knew he was absent. The injury occurred in this way: Wells had his right hand on some stacking sticks, which he was sawing, and with his left hand was pushing the carriage. The saw hung in a stick, and jerked his right hand down on the saw, with the back of his hand towards the saw. Three of his fingers were cut all to pieces and his little finger was cut half off. The plaintiff says that the saw was defective in three particulars: First, that the setscrew which holds the collar to the shaft to which the saw was attached had worn loose, thereby permitting a lateral play of the shaft and saw; second, that the space between the carriage and saw was too wide; and, third, that there was no apron or support on the outside of the saw. Plaintiff states that the wobbling of the saw caused the injury. He admits that he knew of the condition of the saw, and appreciated the dangers of using it in that condition; but he says the defendant had promised to repair it, and that he continued to operate the saw after the promise was made, in reliance of its fulfillment.

John Walden testified: "I was working for the defendant company at the time Wells was injured. I was laying the strips on the carriage, and Wells was operating the saw and carriage."

After stating the defects in the saw and carriage as above set forth, we quote from the record his testimony on the promise to repair as follows:

"Q. Did you ever call any one's attention to the condition of the saw? A. Yes, sir. Q. Whose attention did you call? A. I showed it to Mr. Bates one day. Q. About how many days was that before Wells was injured? A. Something like a couple of weeks, I think, the last I recollect. Q. Was Wells present? A. Yes, sir. Q. Was Bates's attention called to the other things you have mentioned, the floor and no outside support and so on? A. Yes, sir. Q. What did Bates say, if anything? A. Said he would fix it. Q. Who is Bates? A. He is master mechanic."

Walden also stated that he had a conversation with Wells about the condition of the set-screws the day before the injury occurred, and, upon being asked to go ahead and tell the jury what was said, answered: "Mr. Wells said, 'I have told Bates about it, and he wouldn't fix it.' And I said, 'I would go to the commissary and get some screws and fix it myself.' And he said: 'I went up there two or three times after files, and Walters wouldn't notice me, and I don't think there is any use in going any more.' He said if he would not give him files he wouldn't give him screws."

H. B. Wells testified that when he first made complaint to Bates about the saw Bates did not pay any attention to him, and that he still continued to work because he had to work for a living, and jobs were scarce.

On the question of the promise to repair, we quote his testimony from the record as follows:

"Q. Tell the jury whether or not you heard a conversation between Walden and Bates with reference to the condition of the machinery? A. I did. * * * Mr. Walden told him that the machinery was not in the right condition and he said it ought to be fixed, and Bates said, 'I will fix it,' but he never said when. Q. Did he say anything about going ahead and using it or not? A. Yes, he said to go ahead and use it. Q. Where were you at the time it occurred? A. John Walden and me were there at the machine together, and Sherman had gone off after gasoline. Q. Where was Bates? A. He was at the machine with us. Q. Did Bates know that you heard what took place? A. Yes, sir. Q. What was he talking about when he said he would fix it? A. He was talking about that set screw in the collar part of it. We re-

quired a piece on the side of the carriage, and they never put that on. Q. What do you mean by requiring another piece on the side of the carriage? A. Another cross piece like them three was. Q. What do you mean by another cross piece? A. Like them three that was on it, to hold the wood up. Q. To extend the floor of the carriage out to the saw? A. Yes, sir; to extend the floor of the carriage to the saw. Q. That is what you mean when you say that you required another cross piece. A. Yes, sir. Q. Was anything said in that conversation about having no outside support? A. No, sir. Q. Was this discussion about the putting of the other piece on the carriage so as to make the floor come out to the side of the saw in the same conversation that you discussed the collar and the set-screw? A. Yes, sir; at the same time. Q. What was the final conclusion of Mr. Bates after his attention had been called to that? A. I don't remember of him saying whether he would fix that or not; he just said I will fix it and went on. Q. And didn't point out what he would fix? A. Sir? Q. And didn't point out what particular things he would fix? A. No, sir; he never pointed it out. Q. If that had been your regular employment permanently, and promise to move you to another department had not been made and the promise to repair or fix it had not been made, what would you have done? A. I would have quit."

There was a jury trial and verdict for the plaintiff. From the judgment rendered, the defendant has appealed.

It is contended by counsel for defendant that the court erred in refusing to give the following instruction:

"E. The complaint alleged that there were structural defects in the framework of the saw in this, that the space between the saw and the carriage was too wide, and there was no apron on the outside of the saw. The court charges you, as a matter of law, that the plaintiff can not recover for an injury occasioned by such alleged structural defects, even if you should find they were defects."

In order that a servant may be relieved from the operation of the doctrine of assumed risk from a defect complained of, and the danger of which he was no longer willing to incur, it is essential that his remaining in the employment was induced by the promise of the master to remedy the defect, when he

would not otherwise have done so. 26 Cyc. 1212; *Marcum* v. *Three States Lumber Co.*, 88 Ark. 36.

It is insisted by counsel for plaintiff that, under the authority of *St. Louis, I. M. & S. Ry. Co.* v. *Mangan*, 86 Ark. 507, the promise to repair made to Walden inured to the benefit of the plaintiff; but it is equally well settled by that case that one servant can not rely upon a promise to repair made to a fellow servant unless he is informed of it. The reason is that it is essential that the promise shall be relied on, and that the servant shall continue in the employment by reason of the promise. We have copied from the record the testimony of Walden and the plaintiff on the question of the promise to repair.

It might be inferred from Walden's testimony that Bates promised to repair, not only the set screws, but the floor of the carriage and the apron; because he says that he mentioned all these things to Bates, and Bates replied that "he would fix it." But we do not think that plaintiff can say that his assumption of risk was suspended by any promise to repair these structural defects.

According to the plaintiff's testimony, Bates was talking about the set screws when he said he would fix it. Again, he says that he does not remember whether Bates said that he would fix the carriage. He was also asked if anything was said about the outside support, and he replied "No."

The plaintiff admitted that he had already made complaint, and had received no promise to repair, and had voluntarily continued work with a full knowledge of the defects of the machine. It will be noted that plaintiff states that Bates was talking about the defect of the set screws when he said that he would fix it, and that he does not remember about him promising to fix the apron and floor of the carriage.

The master in making the promise, and the servant in acting upon it, fix their mutual relation. It is evident that the plaintiff could only act upon the promise made by Bates as he understood it. If he understood Bates only to promise to repair the set screws and continued to work in reliance upon that promise, he can not be relieved from the risk of other defects which he had knowledge of, and which he knew made his continued use of the saw dangerous. In short, the plaintiff's

own testimony shows that he continued to work because he understood that Bates was to repair the set screws, and relied on his promise to do so.

The liability for the alleged structural defects is not cast upon the defendant because under plaintiff's own testimony he did not continue to work upon a reliance of a promise to remedy these alleged defects.

John Padgett testified that there was no apron or bearing on the outside of the saw that would hold the wood up when it was cut off, and that such an apron or bearing could have been very easily and cheaply put on the saw carriage. The plaintiff himself testified that no such piece was on the end of the carriage, and that it was dangerous to use the machine without this apron or bearing. The jury might have inferred that the plaintiff would not have been injured had this apron been there.

The court then should have eliminated from the consideration of the jury the question of the liability of the defendant on account of these alleged structural defects, and its action in refusing the requested instruction was erroneous.

The error was therefore prejudicial because the instructions as given submitted to the jury issues upon which there was no legal evidence to support a finding, and we can not tell upon which issue the jury based its finding. *St Louis, I. M. & S. Ry. Co.* v. *Denty*, 63 Ark. 177; *Railway Company* v. *Roberts*, 56 Ark. 387.

Counsel for defendant also insist that the judgment should be reversed on account of certain remarks made by plaintiff's counsel in the argument of the case.

We need not consider this assignment of error for the reason that the judgment must be reversed and the cause remanded for a new trial for the error of the court in refusing to give instruction No. E, asked by the defendant. It is so ordered.

FRAUENTHAL, J., dissents.