ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY

*v.* HOLMAN.

## Opinion delivered May 31, 1909.

1. MASTER AND SERVANT—LATENT AND PATENT RISKS.—It was not error, in an action against a railway company for the death of an engineer caused by the engine running into an open switch, to leave to the jury to determine whether the risk from the absence of a lock on the switch stand was so obvious that the engineer was bound to take notice of it in the night time. (Page 563.)

2. SAME—KNOWLEDGE OF RISK BY SERVANT.—Where there was a conflict in the evidence as to whether plaintiff's intestate knew of the risk from which he received fatal injuries, the question whether he had such knowledge before his injuries were received was properly left to the jury. (Page 563.)

3. SAME—ASSUMED RISK—PROMISE OF MASTER TO REPAIR.—Where a railway engineer called attention of the section foreman, whose duty it was to make repairs on the roadbed, to the defective condition of a certain switch, and the latter promised to repair it, the former will not be held, during a reasonable time thereafter, to have assumed the risk of danger. (Page 565.)

4. SAME—CONTRIBUTORY NEGLIGENCE.—A servant who continues to work in a defective place after he has called the master's attention thereto will be guilty of contributory negligence if the nature of the defect is such as to create a danger so obvious that no prudent man would encounter it. (Page 567.)

5. SAME—MASTER'S PROMISE TO REPAIR—REASONABLE TIME.—Where a servant continues in the master's service after making complaint of a defect in an appliance, and after the master promised to repair same, it is a question for the jury to determine whether he continued in the service an unreasonable time while waiting for the master to make such repairs. (Page 569.)

Appeal from Clark Circuit Court; *Jacob M. Carter,* Judge; affirmed.

### STATEMENT BY THE COURT.

John Holman was a locomotive engineer in the employ of appellant. On the 12th day of January, 1908, he was on an engine that was pulling a freight train on appellant's railroad from El Dorado and Camden to Gurdon. About a half or three-quarters of a mile south of Gurdon a switch connected a side track with the main line. Holman's engine ran into this switch, which was

open. On the side track, about four hundred feet from where the engine entered the switch, were freight cars. Holman, seeing that a collision was inevitable, after doing all he could to stop his engine, jumped therefrom and received injuries from which he suffered greatly until January 21, 1908, when he died. A rule of the company required engineers to keep their engines under control while in the yard limits. Holman, when he entered the switch, was within the yard limits, and he had his engine under control. There was no light at the switch, and the switch was unlocked. It was the duty of the railway company to keep lights at the switch and to keep the same locked. The lights revealed the condition of the switch, and the lock on the switch prevented it from being opened except when required. This condition had existed at the switch for some months. Holman's engine ran into the open switch about half past nine o'clock at night. There was a coal oil light on the engine furnished by the company, but the light from this was not sufficient to enable him to see that the switch was open. Holman was 42 years old and a married man. His wife and several children survive him. All of the children were in their teens, some of them quite young. Holman was an affectionate husband and father, devoted to his family. He was moral, and of frugal and industrious habits. He earned from one hundred and fifty to two hundred dollars per month and contributed monthly to the family about one hundred and ten or one hundred and fifteen dollars. His widow, as administratrix, sued the appellant for damages for the benefit of the estate, and also in a separate count sued for damages for herself and children. The complaint alleged that appellant was negligent in failing to keep the switch closed except when it was necessary to transfer cars to it from the branch line; that appellant was also negligent in permitting freight cars to be on the side track without any light to indicate where they were situated.

The appellant's answer denied all the material allegations of the complaint, and charged contributory negligence on the part of Holman, in that he knew of the condition of the switch and in failing to keep his engine under control while running within yard limits at Gurdon, thereby violating the rules and regulations of the defendant. It further alleges that he was guilty of con-

tributory negligence in jumping from his engine at the time he did, and that if he had remained thereon he would not have been injured.

Stephens, one of the brakemen, who was a witness on behalf of appellant, testified in part as follows: "That he knows the switch where the injury occurred, and thinks the lock was there, but that the staple had been broken out so that it could not be locked. That it had been in that condition four or five months, and Mr. Holman knew it, because he (witness) told him about it once. That he told him it could not be locked. That he was on the engine with Mr. Holman one day, and said to him that that switch ought to be fixed; that there was no staple in there, and it could not be locked, and that it was dangerous to go in there over it at night; and that Mr. Holman replied that it certainly ought to be fixed. That this conversation occurred one day—he does not know just when—as they were pulling out of Gurdon, when they were about a mile south of the town. That he told him about it because he thought it was his duty, as he knew it was dangerous, and thought probably by telling him that he might have it fixed. That he knew it was the duty of the section foreman, Oscar Bell, to have it fixed. That he didn't tell him because he didn't see him at that time, although he had known of the condition of the lock for four or five months. That he does not remember how long it was after he discovered that there was no lock before he told Mr. Holman, but thinks that probably it was three or four weeks before he was hurt that he told him. That he had seen Oscar Bell, the section foreman, frequently during this time, but only when his train was in motion."

Oscar Bell, the section foreman, testified among other things as follows: That he knows the switch where Mr. Holman was hurt, and knows there was no lock on it when the injury occurred. That for about four months the lock had been hanging there, but the staple had been pulled out, so that it could not be locked. That Holman knew of this condition because he had said to witness, "Oscar, there ought to be a lock put on that switch—south switch. That is dangerous that way." That he (witness) told him that he knew it was dangerous, and that the roadmaster had told him he would furnish him something to repair it with.

That Holman mentioned it first, but did not say how long he had known of the condition of the lock. That he was hurt in January, and this conversation took place about three or four months before. That the first thing he remembers Mr. Holman saying was that there ought to be a lock on the south switch—that it was dangerous. That he knows it was broken because he had seen it, but does not know how long before this conversation— thinks probably only a few days. That it was not exactly his business to fix this, as there was a yard gang supposed to attend to it. That Mr. Wood and Mr. Wall, both roadmasters at Gurdon, had agreed to furnish a lever to have this fixed. That it was his duty to fix it if he was furnished with something to repair it with. That his duty as section foreman was to keep the tracks in order, which was done by going over them every day. That he told Mr. Holman that as soon as the roadmaster furnished him (Bell) with a lever to put the lock on he would lock it. That he had fixed the switch, but not until after the injury.

The above witness was asked, for the purpose of laying the foundation for impeaching him, the following question: "Did you, at Mrs. Holman's house in Gurdon, Arkansas, on or about the tenth day of August, tell her that John H. Holman, just a few days before he was injured, told you that the lock was broken, and that there was no lock on that switch, and that it ought to be fixed, and that you said—that you told him that the roadmaster had promised to get you another one, and that you would fix it just as soon as you got it?" The witness answered that he did not tell her that, but did tell her that Mr. Holman had spoken to him about the switch stand, and that witness had said that as soon as the roadmaster furnished him with something to fix it with he would do so, but did not say it was just before he was hurt or injured.

Mrs. Holman testified: That she knew Oscar Bell, and that he had on or about the 10th day of August at her house told her that just a few days before her husband was hurt he told Bell that switch ought to be fixed, and that Bell told her husband he would fix it as soon as the roadmaster would give him one.

The following instructions were given on behalf of appellee:

"2. Employees of railroad companies assume all the

risks ordinarily incident to the work they undertake to perform, but not the risks of failures of such companies to perform their duty, nor is it their duty to make inspection or examination to discover latent, defective or dangerous conditions arising from any failure of their employers to discharge their duty; they have the right to assume that such duties have been faithfully performed, and to act on the assumption until they have knowledge or notice to the contrary.

"3.   When an employee of a railroad company has notice or knowledge that his employer has failed to perform his duty of exercising reasonable and ordinary care looking to the safety of the employee in the performance of his work, the employee assumes the risks arising from such failure, if he continues on in his work; but if the employer or his agent, whose duty it is to keep it in repair, tells him that he will repair the defect arising from such failure, then the employee does not assume the risks of injury therefrom, unless the danger is so obvious, patent, glaring or manifest that no person of ordinary prudence would have continued in the work in reliance on such promise, unless he so continues an unreasonable time after the promise.

"4.   If you find from the evidence that the deceased knew that said appliance for opening and closing the switch was broken and defective, so that it could not be locked, and that it was not locked, and had not been for some time, still if you should further find from the evidence that the deceased complained to the section foreman whose duty it was to repair such defects, and that the said section foreman advised the deceased that application had been made by him to the defendant for a new appliance for said switch that could be locked, and that same would be put on said switch as soon as the appliance could be gotten there by the defendant, and that thereafter, relying upon such promise, the deceased continued work in the employment of the defendant, and that the danger arising from the condition of said switch appliance was not so obvious, imminent or glaring that an ordinarily prudent person would not have continued in the same work, then it is for you to say, under all the facts and circumstances of the case, whether the deceased did in fact assume the risk arising from the said condition of said switch appliance.

"5.   If you find from the evidence that it is necessary to

provide switch stands connecting sidings with tracks with locks, so as to avoid the opening or closing of such switches by unauthorized persons or by accident, and that reasonable and ordinary regard and care for the safety of train engineers and operatives requires the providing of such locks and the maintaining of them in proper order, and that the defendant provided its switch stand at the point on its road where deceased is alleged to have been injured with a lock, but afterwards negligently and carelessly permitted the lock to be out of order, or to be removed, and negligently and carelessly suffered such switch stand to remain in that condition, without a lock, and you further find from the evidence that plaintiff's intestate was in defendant's employ as engineer on one of its trains, and was, by reason of said switch being without a lock, and without fault or carelessness on his part, let in with his engine and train upon the side track, and thereby, without fault or carelessness, injured as charged in the complaint, and that he, several days thereafter, died from such injury, you should find for the plaintiff."

The second instruction given on behalf of appellant on the the subject of assumed risk was as follows:

"Where one enters into the employment of another who operates dangerous machinery and appliances, he assumes, and is presumed to have contracted with reference to, all risks and hazards ordinarily incident to such employment, and the master is not liable to such employee for injuries resulting to him from such causes; and while the employee does not assume the risks and hazards extraordinarily attendant upon his duties of employment, nevertheless if the employee in the performance of his duties discovers extraordinary risks of danger, and is capable of appreciating and understanding the increase of danger therefrom, and by the exercise of ordinary care and prudence upon his part could avoid the same, and he continues to act with such knowledge of the increased danger, and is injured in consequence thereof, then the master would not be liable for such injury, and the plaintiff would not be entitled to recover. So in this case if you believe from the evidence that the deceased, Holman, was an experienced engineer, and that at the time he was injured he had previous knowledge of the defect in defendant's switch, and that such defects increased the danger incident to his work, and

rendered his position extraordinarily dangerous or perilous, and with such knowledge he voluntarily took the chances with such extraordinary and increased risk of danger, then he is deemed in law to have assumed such risk of danger, and the master would not be liable to plaintiff for such injury as may have resulted therefrom."

The fifth instruction asked by appellant and given by the court was as follows:

"5. You are instructed that while it is not the duty of the employee using dangerous machinery furnished by the master to inspect the same for latent and hidden defects, the law does require him to take notice of any defect of the same which is patent or obvious, and that can be discovered by ordinary observation. He cannot go blindly ahead regardless of the consequences, but he must use his eyes and make such inspection as ordinary care would require of one whose duty it is to take notice of obvious defects."

There was a verdict in the sum of $4,000 on each count. Judgment was entered accordingly in favor of appellee, and appellant duly prosecutes this appeal.

*E. B. Kinsworthy* and *Lewis Rhoton,* for appellant.

1. The second instruction given at appellee's request is a correct abstract statement of the law of assumed risk, but has no application to this case. It imports into the case the doctrine of latent and patent defects, whereas Holman knew of the defect, and as to him it was not only a *patent,* but also a *known,* defect. 48 Ark. 333; 41 Ark. 542; 56 Ark. 232; 71 Ark. 159; 77 Ark. 367.

2. The third instruction is not supported by the evidence, and ignores the question of contributory negligence, in case the jury should find that the appellant did not, in fact, agree to fix the lock in a certain time, or at all. 71 Ark. 518, 526. It also fails to submit the question of fact to the jury, whether or not, under the circumstances of the case, deceased was guilty of contributory negligence. *Id.*

3. There was nothing definite in the section foreman's promise to repair the lock, nothing upon which as a promise he could rely and dismiss the danger from his mind. The fourth instruction, therefore, erred in stating that if he relied upon the promise he did not assume the risk.

*McMillan & McMillan,* and *Murphy, Coleman & Lewis,* for appellee.

1. The second instruction is correct. The evidence that Holman knew of the defect rests solely upon the testimony of the brakeman and section foreman, both of whom are contradicted by other witnesses and the circumstances. The evidence as a whole shows that as to Holman the defect was latent, could not have been discovered by him without leaving his post of duty, and the circumstances tended to show that he knew nothing of it.

2. Objections to the third instruction are without merit. There was in this case no striking or very threatening danger as in the Chandler case, 71 Ark. 518, which, when fully considered, contains nothing inconsistent with this instruction. Moreover, the question of contributory negligence was fully presented in other instructions.

3. Deceased had the right to rely upon the promise to repair, unless the danger was so obvious and imminent that no ordinarily prudent person would have exposed himself to it. 71 Ark. 526; 88 Ark. 28. The third instruction requested by appellant ignores the promise to repair and the lack of obvious and imminent danger, and seeks to have the jury told that if deceased knew of the defect, and that it made it more dangerous, no matter how slightly, he was guilty of contributory negligence in running the engine over it. The instruction was properly refused.

WOOD, J., (after stating the facts). The questions of negligence and contributory negligence were submitted to the jury upon correct instructions. We deem it unnecessary to discuss, seriatim, the instructions of the court. It is conceded that for the most part they announce correct and familiar principles, but it is contended by appellant that, as applied to the facts of this case, the instructions are abstract, misleading and prejudicial. Among other instructions, to the giving of which appellant objected, were numbers 3 and 4 set out in the statement. In asking these instructions appellee treated the facts as raising the issue of assumed risk, although such defense was not set up in the answer. Appellant also by its prayers for instructions treated it

as an issue in the case. We will therefore consider the objection to the rulings of the court in the giving and refusing of prayers for instructions as if the defense of assumed risk had been properly pleaded.

The appellant contends that, upon the undisputed evidence, the defect in the switch was patent, or, in other words, a defect which Holman, in the exercise of ordinary care for his own safety in the use of the track furnished him, should have discovered. But, whether the defect was obvious or not, appellant contends that the undisputed evidence shows that Holman had actual knowledge of it.

Holman's duties were on his engine. The evidence does not show that an engineer in the performance of his duties could have observed that the switch was unlocked, nor does it show that Holman had ever observed this condition, or that he had the opportunity to do so. See *St. Louis & S. F. Rd. Co.* v. *Marker,* 41 Ark. 542; *Little Rock, M. R. & T. Ry. Co.* v. *Leverett,* 48 Ark. 333. The absence of lights in the night or of targets in the day to show whether the switch is open would be an obvious defect, the risk of which the engineer would assume. But the presence or absence of a lock on a switch stand we do not consider, under the evidence, such an obvious condition as to warrant an instruction as matter of law that the engineer was bound to take notice of it. The utmost that appellant had the right to ask under the evidence here was to have the question submitted to the jury as to whether the defect complained of was a latent or patent one. The appellant had the question submitted in its prayer number five, which the court granted. This instruction at the instance of appellant, and instruction number two at the request of appellee properly submitted to the jury the question as to whether the defect of an unlocked switch was a latent or patent one, and in either case correctly declared what were the duties and rights of the employee.

Instruction number two, at the instance of appellee, would have been abstract, to be sure, if the uncontroverted evidence had shown, as appellant contends it does, that Holman had knowledge that there was no lock on the switch. But we are of the opinion that it was also a question for the jury as to whether Holman had knowledge of the unlocked switch before and at the

time of the injury. True, two witnesses for appellant testify to Holman's having such knowledge. But there are conflicts and inconsistencies in the testimony of these two witnesses. For instance, the witness Stephens says "that he does not remember how long it was after he discovered there was no lock before he told Mr. Holman, but thinks it was three or four weeks before he was hurt." This is the source whence Holman received his first knowledge of the unlocked switch (according to the only evidence in the record), and he received such knowledge (this witness, Stephens, thinks) three or four weeks before he was hurt. Yet, according to the testimony of Oscar Bell, in a conversation between him and Holman that took place three or four months before Holman was hurt, Holman mentioned to him first that "there ought to be a lock put on that switch." According to the testimony of Bell, Holman was telling him the above at least two or three months before Holman himself knew that there was an unlocked switch, if the testimony of Stephens was correct. Then again Stephens and Bell each testified that the lock had never been taken from the switch, but was still there in place, and that the only trouble was that the staple was broken off the switch; Hopkins and Hughes saying there had been one on it a month and a half or two months before. In view of witnesses who had examined the switch, or had had opportunity to observe it, Tillman, Hopkins and Hughes, swore that at the time of the injury, and just before, there was no lock on the switch, Hopkins and Hughes saying there had been one on it a month and a half or two months before. In view of these conflicts and inconsistencies and some other inherent weaknesses in the evidence of Bell and Stephens, and in view of the fact that there was evidence directly tending to impeach Bell, we are not warranted in saying that the undisputed evidence establishes the fact that Holman had knowledge of the unlocked switch before or at the time he was injured. On the contrary, it was peculiarly a question for the jury as to whether he had such knowledge. The court, in instruction number four, at the request of appellee properly submitted to the jury to determine whether Holman had such knowledge, and in instructions three and four, at request of appellee, the court submitted the question as to whether, having such knowledge, under all the circum-

stances of the case, including a promise to repair on the part of
the master, if there was one, Holman assumed the risk arising
from the unlocked switch.   The instructions in effect tell the jury,
on the question of the promise to repair, that, if there was such
promise, and Holman continued in his work under it, he did not
assume the risk of the danger, unless it was so *obvious, patent,
glaring or manifest* that no person of ordinary prudence would
have continued in the work in reliance on such promise, unless he
so continued an unreasonable time after the promise.   The specific
objection to the instruction made at the time by appellant was
"that it was unsupported by the evidence, and that it ignores the
proposition of contributory negligence in case the jury should
find that the defendant did not in fact agree to fix the lock in a
certain time or at all."   The evidence as to the promise to repair
is contained in the testimony of Bell, set out *supra,* and it is am-
ply sufficient to warrant the submission of the question to the
jury as to whether there was such promise.   Bell was the agent
of appellant to make such repairs.   Holman, according to Bell's
testimony, called the latter's attention to the dangerous condi-
tion of the unlocked switch and the importance of repairing the
defect, and Bell told Holman that the roadmaster had promised
to furnish the lever, and that as soon as he did so he (Bell) would
fix the switch.   It was Bell's duty to keep the tracks in order,
which he says he did by going over them every day.   Taking his
testimony as true, the reasonable inference was that there was a
promise to repair, and that it would be done in a very short time,
although no definite time was named.   The effect of a promise
to repair by the master, and of the continuance in his service by
the servant, in reliance upon the promise, is to create a new
stipulation whereby the master assumes the risks impendent dur-
ing the time specified for the repairs to be made.   Where no defi-
nite period is specified in which the given defects are to be rem-
edied, the suspension of the master's right to avail himself of
the defense of assumption of the risk by the servant continues
for a reasonable time.   1 Labatt, Master and Servant, § § 424-25,
and notes thereto.   No matter how obvious the defects or how im-
minent the perils therefrom, the servant, pending the promise
of the master to repair, does not assume the risk of the given
defects by continuing in the master's service in reliance upon his

promise. For, as was said by the Supreme Court of Illinois in *Swift & Co.* v. *O'Neill,* 187 Ill. 337: "By the promise of the master a new relation is created between him and the employee whereby the master impliedly agrees that the servant shall not be held to have assumed the risk for a reasonable time following his promise." *Chicago Anderson Pressed Brick Co.* v. *Sobkowiak,* 148 Ill. 573; *Schlitz* v. *Pabst Brewing Co.,* 57 Minn. 303; *Mc-Farlan Carriage Co.* v. *Porter,* 153 Ind. 107; *Texas & N. O. Rd. Co.* v. *Bringle,* 9 Texas Civil Appeals, 322. This rule is a necessary corollary of the doctrine that the defense of assumed risk rests on contract. *Choctaw, O. & G. R. Co.* v. *Jones,* 77 Ark. 367; *Narramore* v. *C. G. C. & St. L. Ry. Co.,* 96 Fed. 298-301. For it can not be said that the servant has voluntarily assumed the risk of the impending danger of working in an unsafe place, or of the use of obviously defective appliances furnished by the master, where the servant has complained to the master of such defective conditions and agrees to and does continue in his service upon the promise of the master within the time specified, or a reasonable time, if none is specified, to restore the place or appliances to normally safe conditions. The complaint of the servant shows that he is not willing to continue in the employment under the dangerous surroundings. The promise of restoration by the master to secure the continuation of the service of his employees is a confession of a breach of duty which rests solely with him, and which he alone can and should correct. Out of this contractual relation the law declares that for a reasonable time the burden of the assumption of risks and the responsibility for any injury resultant to the careful servant by reason alone of the defective conditions is on the master where it belongs, for he is in the wrong. Judge Cooley says: "If the servant, having a right to abandon the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant by continuing the employment engages to assume the risk." Cooley on Torts, p. 1157; *Dalhoff Const. Co.* v. *Luntzel,* 82 Ark. 82; *Western Coal & Mining Co.* v. *Burns,* 84 Ark. 74; *Hough* v. *Texas & Pac. R.*

*Co.,* 100 U. S. 225; *Greene* v. *Minneapolis & St. L. R. Co.,* 31 Minn. 248; *Pleasants* v. *Raleigh & A. Air Line,* 95 N. C. 195.; *Eureka Co.* v. *Bass,* 81 Ala. 200; *Ray* v. *Diamond State Steel Co.,* 2 Penn. (Del.) 525.

But, while this rule precludes the master from setting up the defense of assumed risk under the circumstances mentioned, it does not foreclose the defense of contributory negligence. That is still open to him, for the employer does not assume the risks of the negligence of his employees during the time when his promise to make repairs should be fulfilled, nor indeed at any time. The law is well settled that if the nature of the defects is such as to create an open, imminent danger such as no prudent man would encounter, and the servant continues at work in the face of this manifest peril, and is injured by reason of the defects, he is barred of any right of recovery because of his own contributory negligence. But where the nature of the defect is not so obviously dangerous as to impress the man of ordinary prudence with a feeling or consciousness of imminent danger in the place where, or in the machinery and appliances with which, he has to do the work, then he may continue in the performance thereof; and if he is injured while so engaged, the master will be liable. *McKelvey* v. *Chesapeake & O. Ry. Co.,* 35 W. Va. 500; 1 Labatt, Master and Servant, § 428. Our own court, in an exhaustive opinion through Mr. Justice HART, has recently thoroughly discussed the questions of the contributory negligence of the servant in connection with the promise of repair by the master, and numerous authorities are cited by him. *Marcum* v. *Three States Lumber Co.,* 88 Ark. 28. Courts (our own among them) and text writers have sometimes overlooked the technical distinction between the separate defenses of assumed risk and contributory negligence in cases where there has been a promise to repair, inaccurately designating the one for the other. See *King-Ryder Lbr. Co.* v. *Cochran,* 71 Ark. 55; *St. Louis, I. M. & S. Ry. Co.* v. *Mangan,* 86 Ark. 507; *Patterson Coal Co.* v. *Poe,* 81 Ark. 343; *Marcum* v. *Three States Lumber Co.,* 88 Ark. 28; 4 Thompson on Negligence, § 4667. In many cases both defenses are alike available, and in such cases, where the servant or employee exposes himself to an obvious and imminent danger, it is of not much real importance whether the case

be disposed of on the one defense or the other. In such cases, as was said by Judge Taft in *Narramore* v. *Cleveland, C. C. & St. L. R. Co.,* 96 Fed. 298, "assumption of risk and contributory negligence approximate when the danger is so obvious and imminent that no ordinarily prudent person would assume the risk of injury therefrom." This is mentioned by Judge Riddick (quoting above) in *Mammoth Vein Coal Co.* v. *Bubliss,* 83 Ark. 567, and again by Chief Justice Hill in *Johnson* v. *Mammoth Vein Coal Co.,* 88 Ark. 243. It might be added that, while these defenses may approximate in certain cases, they can never amalgamate in any case. However, in cases like this where, under the promise to repair, for a reasonable time there can be no assumed risk, the distinction between assumed risk and contributory negligence should be observed. It is a somewhat loose and inaccurate characterization to name as assumed risk that which, under the hypotheses stated in instructions two and three, could only be contributory negligence during the time for the fulfillment of the promise to repair. But no possible prejudice could have come to appellant by an error of that kind. In fact, the inaccuracy in telling the jury that Holman might have assumed the risk under a promise to repair if the danger was so obvious, patent, glaring or manifest that no person of ordinary prudence would have continued at the work, etc., was more favorable to appellant than the law and facts warranted. The instructions, taken together, left the jury to determine whether or not the facts existed that would constitute a promise to repair on the part of the master and a continuance of the work in reliance upon such promise by the servant, and whether or not the danger was so obvious, patent, etc., that no prudent person would have continued in the service; and, finally, left the jury to find "under all the facts and circumstances of the case whether the deceased did in fact assume the risks arising from the condition of the switch appliance." The instruction condemned by this court in *Kansas & Texas Coal Co.* v. *Chandler,* 71 Ark. 518, told the jury that "if the plaintiff (a mine worker) requested his foreman to furnish him props to keep the mine roof from falling, and the foreman promised to do so, and plaintiff relied upon such promise and continued to work under the dangerous roof, he did not assume the risk of so doing." Judge Riddick, speaking for the

court, said: "But, conceding that he did not assume the risk incident upon the failure to furnish the props necessary to support the roof, it does not follow that he was guilty of negligence in working under an unsupported roof; for the fact that the foreman promised to furnish the props necessary to support the roof did not justify the plaintiff in exposing himself to danger so obvious that no person of ordinary prudence would under like circumstances have exposed himself to it. As before stated, whether he was guilty of negligence in remaining at his work when there were no timbers on hand to support the roof is a question for the jury to determine, from a consideration of all the circumstances of the case."

The instructions in the case at bar avoided the very error pointed out in the above case, and conformed to the law as there announced, and to the doctrine of several other recent cases. See especially *St. Louis, I. M. & S. Ry. Co.* v. *Mangan,* 86 Ark. 507, and instruction number 8 approved in that case.

If there was a promise to repair, it was purely a question for the jury under the evidence as to whether Holman continued in the service an unreasonable time waiting for the master to make his promise good. For, if Holman knew of the defect at all, according to the testimony of at least one of appellant's witnesses, the jury might have found that it was only three or four weeks before his injury that he became aware of it. The court declared the law correctly on the doctrine of assumed risk, leaving out the promise to repair, in appellant's prayer number two. In this and other instructions the court fully and fairly presented to the jury every question that the evidence warranted from the viewpoint of appellant as well as appellee. Appellant could not have been prejudiced by appellee's prayer declaring it to be the duty of the appellant to cause inspections to be made of its tracks and switch stands. While it is true that no specific negligence in that particular is charged, it is equally true that the negligent conditions alleged could not have existed, had there been proper inspection. Negligence in the particulars alleged is proved by the undisputed evidence. We are of the opinion, upon the whole record, that there was no error in the instructions prejudicial to appellant, and that the evidence was sufficient to sustain the verdict. The judgment is therefore affirmed.