SCOTT *v.* WISCONSIN & ARKANSAS LUMBER COMPANY.

Opinion delivered March 28, 1921.

1.  TRIAL—DIRECTED VERDICT.—If there is any evidence tending to establish an issue in favor of a party, it is error to direct a verdict against him.

2.  MASTER AND SERVANT—DIRECTED VERDICT—CONTRIBUTORY NEGLIGENCE.—It was error to direct a verdict against the administrator of an employee who was killed while in performance of duties, upon the ground that the undisputed evidence showed that the death of the deceased was caused by his own negligence, if reasonable minds might differ as to whether the manner in which the deceased was doing the work was so obviously and imminently dangerous that no prudent man would have undertaken it.

3.  MASTER AND SERVANT—NEGLIGENCE—JURY QUESTION.—Evidence *held* to present a question for the jury as to whether a lumber company was negligent in failing to exercise ordinary care to furnish a safe place to an employee employed in unclogging a conveyor trough, and, if so, whether the defective condition of such place was the proximate cause of the death of deceased who was caught on a shaft while engaged in unchoking the conveyor.

4.  MASTER AND SERVANT—ASSUMED RISK.—When a master is negligent in having a projecting set screw where it might catch in the clothes of one engaged in unclogging a conveyor, of which condition deceased had no knowledge, he did not assume the risk therefrom unless such dangerous condition was so open and obvious that, in the exercise of ordinary care, he should have discovered it.

5.  MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE.—Where an employee, in obeying the express commands of his superior and in the customary way, undertook to unclog a wood conveyor while the belt was running and was caught on a shaft and killed, the question whether deceased was negligent *held* under the evidence to be a question for the jury.

Appeal from Howard Circuit Court; *James S. Steel,* Judge; reversed.

*Andrew I. Rowland, D. D. Glover* and *J. G. Sain,* for appellant.

The testimony here warranted the submission of the controversy to a jury, and it was error to direct a verdict for the defendant.

When a servant enters the employment of the master, he only assumes the usual and ordinary risks of the employment, and does not assume the negligence of the master, or the master's servants unless he knew and appreciated it. There is no testimony that deceased knew that defendant's servants had put this setscrew in the lineshaft. The testimony shows that this set screw was of unusual and dangerous length and not intended for a small shaft of this kind. Deceased did not assume the risk, and whether he did or not was for a jury, under proper instructions. 86 Ark. 508, 515; 97 *Id.* 347; 102 *Id.* 646; 105 *Id.* 353; 111 *Id.* 9; 113 *Id.* 45; 123 *Id.* 119; 90 *Id.* 555, 226; Labatt on Master and Servant, §§ 7-14.

It is the duty of the master to make reasonable inspections to see that the place of work and appliances are safe. 90 Ark. 227. It is his duty to exercise ordinary care in discovering defects and in repairing them, and he is liable if he fails to exercise due care in selecting a safe place to work and safe appliances for the servant to work. 91 Ark. 389; 87 *Id.* 321; 92 *Id.* 502.

In determining whether or not a verdict is properly directed, plaintiff's evidence should be given the strongest probative force.

A case was made for a jury here. 105 Ark. 401; 79 *Id.* 53; 86 *Id.* 244; 87 *Id.* 321.

Ordinarily the question of assumed risk is one of fact for a jury, unless the facts are undisputed. 98 Ark. 29; 91 *Id.* 102; 92 *Id.* 502, 554; 95 *Id.* 291; 89 *Id.* 372; 96 *Id.* 451; 104 *Id.* 267; 99 *Id.* 490; 120 *Id.* 208. See, also, 124 Ark. 588; 132 *Id.* 385; 134 *Id.* 136; 77 *Id.* 458; 86 *Id.* 329, 507; 88 *Id.* 28; 88 *Id.* 556; 82 *Id.* 86; 102 *Id.* 460.

*W. R. Donham* and *T. D. Wynne,* for appellee.

The alleged negligence was not the cause of the injury. The proof must establish a causal relation between the negligence complained of and the injury sustained. A master may be guilty of negligence in operating defective machinery, yet the proof may show that the negligence existing was not the cause of the injury sus-

tained.  76 Ark. 440.  There can be no recovery if the evidence tends to prove that the accident was not caused by the defect complained of.  4 Labatt on M. & S., par. 1570.  The uncontradicted proof here is that the defects complained of were not the cause of the injury, and the court properly directed a verdict for defendant.

Before a servant is relieved of the assumption of risk by reason of complaint and promise to repair, it must be established (1) that the servant complained of the identical defect which caused the injury; (2) that the complaint was made because of a fear that a continuation in the employ of defendant with the defects complained of would jeopardize the employee's personal safety, and (3) that the employee continued in the work because of the promise to repair having been made.  Applying the facts to these fundamental principles, the court properly directed a verdict.

WOOD, J.  The Wisconsin & Arkansas Lumber Company, hereafter called appellee, is a corporation having a mill plant and engaged in the business of manufacturing lumber and other timber products at Walco, Arkansas.  Roy Scott, hereafter called deceased, had been in the employ of the appellee for more than eight years. For more than two and a half years prior to his death, he was employed in the capacity of lath mill foreman. While in the discharge of his duties as such foreman on the 30th day of January, 1920, his clothing was caught on a line shaft, and he was killed.  The deceased was twenty-nine years old and left surviving him a widow and five children.  This suit was brought by his father, hereafter called appellant, as administrator, against appellee, to recover damages for the benefit of the widow and children of the deceased.

In addition to the above facts, which are undisputed, the testimony on behalf of the appellant tended to prove the following facts:  In connection with the mill plant and situated on or near the first floor of the lath mill is a machine called the "hog" which cuts up slabs into

small particles. This material is used to furnish the greater part of the fuel of the furnaces for eight boilers which supply power for the entire mill plant, which had a cutting capacity from one hundred to one hundred and thirty-five thousand feet of lumber a day, log scale. This fuel material was discharged from the hog into conveyor boxes or troughs about eighteen inches or two feet wide and fourteen or sixteen inches deep. The bottom of these troughs were lined with sheet iron along which run endless conveyor chains, which convey the fuel to the furnaces. About eighteen or twenty feet from the lath mill floor was a line shaft. The box conveying the fuel material ran from the hog to near this line shaft up an incline at an angle of about twenty degrees and a distance of one hundred or one hundred and thirty feet. The conveyor trough from the hog was operated by a belt and pulley located on a line shaft which is about two feet from the elevated end of the conveyor trough. From the end of the conveyor trough to the sprocket wheel which pulled the conveyor chain was about two and a half or three feet. About two and a half feet beneath the elevated end of the trough and the sprocket wheel which moved the conveyor chain was another trough and a conveyor chain which carried fuel into the boiler room. These troughs and chains ran at right angles to each other at the elevated end of the trough from the hog. Near the elevated end of the trough conveying fuel from the hog there were holes in the lining of the trough. Pieces of the fuel would catch in these holes and in the sprocket wheel. This had caused the conveyor chains to stop frequently. In order to reach the machinery at this elevated point, a ladder about five or six feet long extended from the floor to a running board ten or twelve inches wide, which ran by the side of the trough from the hog to a point within two or three feet of the end of that trough. When the conveyor chain and sprocket wheel became clogged, this stopped the conveyance of the fuel from the hog. To unclog the conveyor

chain and sprocket wheel at that elevation, one had to ascend the ladder and walk over the plank walk and stand with one foot on the end of the plank and the other on the top of the trough running to the fuel house. When one went up the walk way to the end thereof, he was in a position about two feet from the line shaft and pulley to his left and about two feet from the sprocket wheel pulling the conveyor chain from the hog on the right, and in front of him was a brick wall at a distance of three or four feet. When one stood with one foot on the plank walk and the other on the side of the conveyor trough running to the fuel room, the line shaft and pulley were to his back, and the sprocket wheel and end of the conveyor trough from the hog would be in front of him and the brick wall to the left. Whatever position he assumed he was surrounded on one side by the revolving shaft, on the other by the brick wall, and on the other by the sprocket wheel. The above was the customary way of unchoking the conveyor chain and sprocket wheel, whether done by the foreman or some one else. There was no other way provided, and it was the custom to do it while the machinery was going. If the belt had been thrown, it would have stopped the shaft, the lath mill and the hog, and the supply of fuel from that source would have been cut off. There was a set-screw near the upper end of the line shaft next to the cog-wheels on the collar about opposite where one would have to stand to unchoke the conveyor chain as indicated above. This set-screw was not sunk, but protruded about an inch or an inch and a half from the shaft.

On the morning of the 30th of January, 1920, the deceased, up to eight or nine o'clock, had unchoked the conveyor chain five times. About nine o'clock the general foreman of the appellee said to the deceased, "Roy, we want all the fuel pushed through that hog we can get." The deceased replied, "I don't know what about your fuel unless we can get something done to that conveyor." The foreman said, "Don't let that hog stop today. We are short of fuel; watch her close and keep her unchoked, and

keep her going steady. I will fix it tomorrow." The deceased replied, "I will do my best," About 1:30 o'clock p. m. of that day the deceased was killed while unchoking the conveyor chain. His jumper was caught in the set-screw and wrapped around the line shaft, which was revolving from one hundred and twenty-five to one hundred and thirty revolutions per minute. It was rather dark at the place where the deceased was killed, but not so dark as to require a lantern in the day time to work by. The set-screw could not be seen when the line shaft was revolving. It was the duty of the deceased to look after the machinery in the lath mill and to keep the same going and to call attention to any repairs necessary to be done, but it was not his duty to make the repairs. That duty devolved on the millwright.

On behalf of the appellee, the testimony tended to prove that the proper way to make repairs on the sprocket wheel and to unclog the conveyor chain from the hog was to throw the belt off, which could be done by pushing it with the foot or with a stick. There was no danger in doing it that way. The general foreman testified that he didn't remember the deceased making any complaint on the morning he was killed about the conveyor trough. Witness did not know that deceased was going, or had gone, to the place where he was killed until they reported that he was killed. It was the witness' duty to see the repairs kept up, which he did as much as possible. Witness did not urge the deceased to keep the chain going or complain of the fuel being short. Witness did not promise to make any repairs. It was witness' duty to have repairs made. He had millwrights under him for that purpose. Witness did not know whether the conveyor troughs had any holes in them or not. Witness had not made any provision in there to get to the sprocket wheel and conveyor chain except the plank walk. On the morning that the deceased was killed, there was a piece of slab three or four feet long fastened in between the chain and sprocket wheel.

Witness did not pay any attention to the set-screw before the injury. Witness was an experienced mill man, having been foreman of various large mills, and in his judgment it didn't make any difference in a place like that as to whether the set-screw was sticking out an inch above the collar or not. According to the general custom among the best mills, some of them have the shaft screws counter sunk, and some of them are left sticking out.

One of the witnesses for appellee, who was assistant foreman of the mill at the time the deceased was killed, testified that he had known the deceased all the time he was an employee of the appellee—seven or eight years. Witness had seen the deceased in the locality where he was killed a number of times before, Witness supposed he went up there on his own accord. Witness had been up there and caught hold of him and demanded that he come out of danger. Deceased would be pulling out the long sticks and slabs that would get up on that chain and stop the chain from moving. Witness went up there himself, but it was not witness' place to have the deceased with him at all. When witness went up there to unclog the sprocket wheel, it was witness' duty to disbelt the machinery in order to keep down danger, and witness took his foot or something and kicked the stuff out of the sprocket wheel and the conveyor chain. Witness generally kept a stick there to throw the belt. If there wasn't any stick there, he would touch it with his foot, and it would fly right off. The deceased knew how the belt was thrown, for witness had told him, and the deceased had seen witness throw the belt a great many times. If anybody got in there with the belt running, they were putting up their lives as a sort of a joke. They were taking chances. Witness told the deceased when he saw him in there to come out; that if that shaft ever got caught in a man's clothes it would kill him. The sticks had been catching in the sprocket wheel under the conveyor chain ever since the mill had been running. They didn't have

any place for a man to work in there because it was not a place for a man to work.  If the deceased got in there to unchoke it while the machinery was running, he would have to stand with one foot on the plank and the other on the edge of the conveyor box.  Witness supposed that the set-screw, from the way all the other set-screws are, would stick out from a quarter to half inch— not over five-eighths of an inch at the outside.  It was the practice to shift set-screws from place to place and after the death of deceased the set-screw around which his clothes were wound was shifted to another place. Another witness who had eighteen or nineteen years' experience as a millwright testified on behalf of the appellee that it was not safe to run a line shaft with a set-screw sticking out of the collar five-eighths of an inch, unguarded or unshielded by anything.

There was testimony also on behalf of the appellee tending to show that the deceased's clothing was not caught in the set-screw, but was wrapped around the line shaft and over the set-screw.  Other witnesses testified on behalf of the appellee corroborating substantially the testimony of the above witnesses and showing that it was the duty of the millwrights and not the foreman to make the repairs and adjustments that the deceased was making.

The appellant alleged that the appellee was negligent in failing to exercise ordinary care to furnish the deceased a safe place to work, and set out in detail the facts which his testimony tended to prove, as above set forth.  The appellee in its answer denied specifically the allegations of negligence in the complaint and set up as affirmative defenses contributory negligence and assumed risk on the part of the deceased.  The appellant presented several prayers for instructions asking the court to submit to the jury the issues which he conceived were raised by the pleadings and sustained by the evidence in his behalf.  The court refused all these prayers, to which ruling the appellant duly excepted.  Thereupon the court on its own motion instructed the jury to return

a verdict in favor of the appellee to which ruling appellant duly excepted. A verdict was returned as directed, and a judgment was entered in favor of the appellee, from which judgment is this appeal.

1.    The recitals in the judgment show that the trial court directed the verdict in favor of the appellee on the ground that the undisputed evidence showed that the death of the deceased was caused by his own negligence. In directing the verdict the court told the jury that the deceased went into a place knowing it to be dangerous and knowing it to be absolutely unsafe. In *St. L., I. M. & S. Ry. Co.* v. *Holman,* 90 Ark. 555-567, we said: "The law is well settled that if the nature of the defects is such as to create an open, imminent danger such as no prudent man would encounter, and the servant continues at work in the face of this manifest peril, and is injured by reason of the defects, he is barred of any right of recovery because of his own contributory negligence. But where the nature of the defect is not so obviously dangerous as to impress the man of ordinary prudence with a feeling or consciousness of imminent danger in the place where, or in the machinery and appliances with which he has to do the work, then he may continue in the performance thereof; and if he is injured while so engaged, the master will be liable."

Since the trial court directed the verdict in favor of the appellee on the evidence, in testing whether or not its ruling is correct, we must give the evidence its strongest probative force in favor of the appellant. "If there is any evidence tending to establish an issue in favor of a party, it is error to direct a verdict against him." *Barrentine* v. *Henry Wrape Co.,* 120 Ark. 208; *Farmers' Bank* v. *Johnson,* 105 Ark. 136; *McDonald* v. *St. L., I. M. & S. Ry. Co.,* 98 Ark. 334, and cases there cited. A directed verdict in favor of the appellee was proper only if under the evidence and all reasonable inferences therefrom the appellant in law was not entitled to recover. *Works* v. *Fort Smith Biscuit Co.,* 105 Ark. 526. The ques-

tion here is whether reasonable minds, viewing the evidence in its most favorable light for the appellant, could have returned a verdict in his favor. If so, the court erred in directing the verdict. If not, then the ruling of the court is correct. *St. L., I. M. & S. Ry. Co.* v. *Cone,* 111 Ark. 309; *St. L., I. M. & S. Ry. Co.* v. *Coleman,* 97 Ark. 438, and cases there cited.

Applying the above familiar rules to the facts of this record, we are convinced that it should not be declared as a matter of law that the method pursued by the deceased in unclogging the sprocket wheel and conveyor chain subjected him to such an open and imminent danger that no prudent man, under the circumstances, would have undertaken it. True, the testimony on behalf of the appellee tended to prove that it was dangerous for any one to undertake to unclog the sprocket wheel and conveyor chain in the manner it was being done by the deceased, unless the belt was thrown—"that if anybody got in there with the belt running they were putting up their lives as a sort of joke—they were taking chances." But, on the other hand, the testimony on behalf of the appellant tended to prove that the deceased was unclogging the conveyor chain and sprocket wheel in the customay way; "that it was the custom to do it while the machinery was going." There was no rule of the company forbidding employees going into the place where the deceased was killed to unclog the sprocket wheel and conveyor chain without first throwing the belt and stopping the line shaft and other moving machinery. Even if there had been such a rule, the testimony on behalf of appellant would have warranted the conclusion that same had been abrogated by a custom acquiesced in by the general foreman of the company, whose duty it would have been to enforce the rule. Witnesses for the appellant testified that the customary way of doing it was to unchoke it while it was running, and these witnesses testified that about 9:00 o'clock on the morning of the day when the deceased was killed, the

general foreman of the mill plant told the deceased "not to let the hog stop that day—to watch her close, keep her unchoked—and keep her going steady." It was shown that the conveyor chain had been stopped four or five times before that on that morning; that the general foreman knew that it was choking, and hence gave the deceased the orders indicated in order that there might not be any shortage of fuel for the boilers.

Now, in view of the fact that there was testimony tending to prove that the custom was to unclog the sprocket wheel and conveyor chain while the machinery was running, and that the deceased when he was killed was pursuing that custom, and in doing so was obeying the orders of his superior, the general foreman, it occurs to us that reasonable minds might differ as to whether or not the danger incident to unclogging the conveyor chain and sprocket wheel in the manner indicated was so obvious and imminent that no prudent person would undertake it. In appellant's complaint there is a general allegation that the appellee was negligent in failing to exercise ordinary care to provide the deceased a safe place to work, and the specific acts constituting such negligence are alleged to be the using of a line shaft with a set-screw of unusual length sticking up near the end of said line shaft without any shield or protection over it, and the using of a conveyor box in which the lining had become defective causing the same to choke with the slabs and fuel material being conveyed. The testimony tended to prove that this defective condition of the conveyor trough caused the conveyor chain to become clogged more frequently than would have been the case otherwise. The protruding set-screw on the line shaft, when the latter was in motion, undoubtedly enhanced the danger of unclogging the sprocket wheel and conveyor chain while the machinery was running. Under the evidence, it was a question for the jury to determine whether or not the appellee was negligent in failing to exercise ordinary care to correct these conditions, and whether

such conditions were the proximate cause of the death of the deceased.

There was testimony on behalf of the appellant tending to prove that the place where the deceased was killed was rather dark, and that the set-screw could not be seen when the line shaft was revolving. It was not the duty of the deceased to place the set-screws in the first instance, nor to shift them from place to place. The duty of construction and making repairs devolved upon the appellee and was intrusted to other servants. The deceased had no duty of inspection either, except to discover the repairs that were necessary to keep the lath mill running. The deceased, while unclogging the sprocket wheel and conveyor chain, was performing a servant's duty, and he assumed all the ordinary risks incident thereto. But a servant does not assume any risk arising from the use of defective machinery caused by the negligence of the master, unless he knows thereof and appreciates the danger incident to its use; or unless the defect and danger are so patent that one, in the exercise of ordinary care for his own protection in the performance of his duties in the usual and ordinary manner with the machinery furnished him, would necessarily discover the defect and know and appreciate the danger. Therefore, if the appellee was negligent in having a projecting set-screw at the place where the same was located, and if the deceased had no knowledge of such defective condition and did not appreciate the danger thereof, and if the defect and danger were not so open and obvious that in the exercise of ordinary care in the performance of his duties he should have discovered same and have known and appreciated the danger, then he did not assume the risk if he was discharging his duty of unclogging the sprocket wheel and conveyor chain in the customary way acquiesced in by the appellee.

2. The primary duty of a servant is to obey the orders of his master. *Central Coal & Coke Co.* v. *Fitzgerald,* 146 Ark. 109. Therefore, if the general

foreman of the appellee had directed the deceased "not to let the hog stop that day — to keep it going steady," meaning thereby that the deceased should unclog the sprocket wheel and conveyor chain without throwing the belt, and while the machinery was in motion, then if the deceased was caught by the projecting set-screw on the revolving line shaft and thereby lost his life while carrying out the orders of his superior, he did not assume the risk, and the appellee would be liable, unless the danger of attempting to unclog the sprocket wheel and conveyor chain while the machinery was in motion was a danger so obvious and imminent that no servant in the exercise of ordinary care and prudence would have undertaken it despite the directions if his master. If the danger was so obvious and imminent that no servant, in the exercise of ordinary care and prudence, would have encountered it notwithstanding the directions of the master so to do, then the deceased in undertaking to carry out the orders of the general foreman, if there were such orders, was guilty of contributory negligence. It occurs to us that the trial court erred in holding that the undisputed evidence proved such to be the case.

The above principles of law concerning the relation of master and servant applicable to the facts which the testimony in this record tended to prove are well established by the authorities generally and have been announced by this court in numerous cases. Most of the decisions of this court bearing upon the issues here involved are cited in the excellent briefs of counsel for the respective parties. An examination of the cases upon which appellee relies for an affirmance of the judgment will discover that the facts in those cases differ in essential particulars from the facts of the present case. It could serve no useful purpose and would unduly extend this opinion to review them.

Our conclusion is that the issues of the alleged negligence of the appellee, and of the assumption of risk and contributory negligence on the part of the deceased,

should have been sent to the jury under appropriate instructions of the trial court. For the error of the court in directing a verdict in favor of the appellee, the judgment is reversed and the cause is remanded for new trial.