READER RAILROAD v. SANDERS.

4-4094

Opinion delivered January 20, 1936.

Gaughan, Sifford, Godwin & Gaughan and McRae & Tompkins, for appellants.

Pace & Davis, Wm. F. Denman and Tom W. Campbell, for appellee.

MEHAFFY, J. The appellee filed suit in the Nevada Circuit Court against the appellant, alleging that he was shop foreman and master mechanic, and that, while he was standing on the running board of an engine in the shop on March 21, 1932, a tree fell upon the shop roof, mashing in the sheet-iron roof, and that certain

rafters or pieces of limbs struck him on the head, knocking him from the running board to the floor, where he fell across a carpenter's horse, severely injuring him. He alleged that the injury was caused by the joint and concurring negligence of appellant and Ray Oliver, its agent and servant; that Oliver selected the location for the railroad shop and constructed the same; that there was a large black-gum tree standing near and leaning over the shop, and that prior to the construction of the shop Oliver had raised into position a heavy tank, by means of a block and tackle attached and anchored to said tree by means of a wire cable or chain, which was tied around the tree twenty or thirty feet above the ground; that when the tank was raised the wire cable cut into the tree to such an extent that the cable could not be removed, and it was cut and left embedded in the tree; that the tree was weakened and made dangerous by being cut by the cable; that Oliver's attention was called to the condition of the tree by appellee, and to the danger, and appellee asked Oliver to remove the tree; that a complaint and promise to remove was made about a week or ten days prior to the date the tree fell; that appellee relied on Oliver's order to continue his work and continued his work in the shop under Oliver's promise to remove the tree, and was so engaged when the tree fell and injured him; that his injuries are permanent.

The appellant filed motion to quash service, which was overruled by the court, and Oliver filed motion to make the complaint more definite and certain. This motion was complied with.

The appellant answered denying the allegations in the complaint and pleading assumed risk, and also alleged that appellee was guilty of negligence in permitting the tree to remain there. It further alleged that the tree fell as the result of an unusual and violent wind storm, an act of God, and not as a result of being weakened by the cable or chain cut. Appellant alleged that it had paid to appellee $7,326.16.

Oliver filed separate answer denying the material allegations of the complaint, and also alleging the contributory negligence of appellee, and that his right to

recover against him was barred by the statute of limitations.

There was a verdict and judgment for $41,350. The case is here on appeal.

Appellant contends that the court erred in refusing to direct a verdict for the defendants because Sanders assumed the risk. The evidence shows that Sanders had complained several times about the tree being dangerous, and he testified that six or seven days before the accident he said to Oliver: "There is nothing to keep you from cutting that tree down and getting it out of the way," and Oliver said: "All right, Sanders. I'll get Joe Berry and his crew around here in a day or two and an engine, and cut it down and get it off your mind." He further testified that he relied on this promise of Oliver. Appellee had called Oliver's attention to the tree six months before the accident, and then again approximately three months, but the time that he called his attention to it and Oliver promised to remove the tree, was six or seven days before the accident. Doubtless the tree had become more weakened and more dangerous as time went on, and had become so weakened at the time Sanders last spoke to Oliver about it, that it was dangerous, and for that reason Oliver agreed to remove it. Appellee testified that Oliver was superintendent and that he was under Oliver. It could not, however, be removed immediately, because, in order to remove it, it was necessary to get an engine and Berry's crew. Oliver, having expressly promised to remove the tree, the appellee had a right to assume that he would do this within a reasonable time, and did not assume the risk within such a period of time after the promise as would be reasonably allowed for removing the tree. The situation was such that he could not go out and move it immediately, but, as we have said, it was necessary to get an engine and to get Joe Berry and his crew. We think the appellee had the right to continue to work without assuming the risk within such time after the promise as it would reasonably require to remove the tree. *Western Coal & Mining Company* v. *Burns*, 84 Ark. 74, 104 S. W. 535; *Simms Oil Co.* v. *Durham*, 180 Ark. 366,

21 S. W. (2d) 861; *St. L. I. M. & S. Ry. Co.* v. *Holman*, 90 Ark. 555, 120 S. W. 146.

In the case of *St. L. I. M. & S. Ry. Co.* v. *Holman, supra,* the court said: ''The effect of a promise to repair by the master and of the continuance in his service by the servant in reliance upon the promise, is to create a new stipulation whereby the master assumes the risk impendent during the time specified for the repairs to be made. Where no definite period is specified in which the given defects are to be remedied, the suspension of the master's right to avail himself of the defense of assumption of the risk by the servant continues for a reasonable time. No matter how obvious the defects or how imminent the perils therefrom, the servant, pending the promise of the master to repair, does not assume the risk of the given defects by continuing in the master's service in reliance upon his promise.''

The court also, in the same case said: ''For it cannot be said that the servant has voluntarily assumed the risk of the impending danger of working in an unsafe place, or of the use of obviously defective appliances furnished by the master, where the servant has complained to the master of such defective conditions, and agrees to and does continue in his service upon the promise of the master within the time specified, or a reasonable time if none is specified, to restore the place or appliances to normally safe conditions.''

Numerous authorities might be cited, but it is sufficient to say that the settled rule of this court is that where the servant has called the attention of the master to the defect and the master had promised to repair, the servant, by continuing the work for a reasonable time, does not assume the risk.

There was some conflict in the evidence, and this was therefore a question for the jury. This doctrine was recognized in the instruction requested by appellant and given by the court, which is as follows:

''If you find from the evidence that the tree was cable or chain cut to such an extent that it was dangerous to the men working in the shop, and that Sanders knew this was true, and you further find that Sanders

continued working in the shop without complaint or objection, then he assumed all risk and dangers arising from said tree, and your verdict should be for the defendants.''

According to the evidence of appellee, however, Sanders did not continue working without objection, but objected, and the master promised to repair.

The court, at the request of the appellant, also gave instruction No. 14 which told the jury in effect that if Sanders knew the condition of the tree and had complained to Oliver, and if they further find that a hard March wind was blowing which increased the danger and made the danger so imminent and obvious that a reasonably prudent person would not have continued working in the shop until the tree was cut down, and if they further found that Sanders did not stop but continued working, then he was not entitled to recover. There is a good deal of conflict in the evidence about the wind, but they were plainly told in the fourteenth instruction that if the danger was so imminent and obvious that a reasonably prudent person would not have continued working, Sanders could not recover.

Appellant calls attention to several authorities to the effect that where the servant has full knowledge of the defect, and where the defect could have been remedied in a few hours, he assumed the risk by staying an unreasonable length of time.

In all cases where there is a conflict of evidence the question of assumed risk is for the jury, and this court cannot set aside a verdict because it may think it is against the preponderance of the evidence.

It is next contended by the appellant that the court erred in refusing to direct a verdict for Ray Oliver because of the contributory negligence of Sanders. Instruction No. 9, requested by appellant and given by the court, submitted to the jury the question of Sanders' negligence, and the jury found against appellant's contention.

This court has said: ''The existence of negligence is always a question for the jury unless the acts com-

plained of are declared by law to be negligent *per se,* or unless all reasonable minds must conclude that the acts were necessarily negligent." *Keller* v. *White,* 173 Ark. 885, 293 S. W. 1017.

It is next contended that the court erred in giving certain instructions and in refusing to give certain other instructions. We do not discuss the instructions in detail, but we have carefully considered all the instructions and have reached the conclusion that the charge as a whole was a correct guide for the jury and that the court committed no error in giving or refusing to give instructions.

It is next contended that the verdict is excessive. Appellee testified that he was standing upon the running board on the left side of the engine, and all of a sudden a crash came. When this crash came something struck him on the left side of his head, knocked him off the engine, and in falling he struck his left hip and lower part of his back across a carpenter's horse, 12 or 14 inches high; knocked him unconscious; did not know what happened to him; he was then treated by Doctor Hesterly; was in the hospital at Prescott 21 days; hip and back hurt so badly he could not sit up, and had headaches until he could hardly see; could not walk. He was then sent to Hot Springs by the advice of Dr. Hesterly, and at Hot Springs they sent him to the Ozark Sanitarium, where he stayed about three months, and he is still under the treatment of Dr. Scully. Before he was injured he was a strong, healthy man, 35 years old, had been drawing $225 per month up to a short time before he was injured, and has been trying to get well. The pain set up immediately after the accident and continued to get worse. The misery was so bad that he could not stand it until they gave him medicine to relieve the pain; he finally went into convulsions; had headaches so severe that they could hardly hold him in bed; his eye was swollen; he testified also that if he were to try to walk a quarter of a mile today he could not get out of bed tomorrow; his legs have practically no feeling in them; he has never been able to earn a dollar since the injury.

Dr. Scully testified that when he was called Sanders was unable to walk, and was in a semistupor. He testified at length about his treatment and about appellee's injuries, and that his injuries were permanent.

Dr. McGill testified to substantially the same conditions testified to by Dr. Scully, and Dr. McGill also testified that the appellee had severe injuries to his nerves, including the nerves of the lower limbs, groin, rectum, buttocks and privates.

When appellee's injuries are considered, the amount he was earning, the fact that he is unable to earn anything now, and also that his injuries are permanent, and when his pain and suffering are considered, we do not think the verdict is excessive.

But the evidence shows that the appellant had already paid to him and for him $7,326.16, and also shows that when the verdict was returned, the jury was asked if they intended to deduct the advances made to appellee by appellant, from the $45,000. The jury answered in the affirmative. There was some discussion then as to whether the part paid directly to appellee, or the entire amount paid to him and for his benefit should be deducted. It is our conclusion from the questions asked the jury and the answers by the foreman of the jury, that it was the intention of the jury to render a verdict for $45,000 less the entire amount paid.

The court entered judgment for the amount, $45,000, less the amount paid directly to the appellee. We think this is error and the court should have entered judgment for the $45,000 less the entire amount paid, which would leave $37,673.84.

The judgment will be modified by reducing the amount to $37,673.84, and, as thus modified, the judgment is affirmed.